**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| TENISHA R. WILSON | ) | CASE NO. |
| and | ) | |
| DENMAN GORDON | ) | |
| 1004 Newberry Road | ) | JUDGE |
| South Euclid, OH  44121, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| CITY OF SOUTH EUCLID | ) | |
| 1349 South Green Road | ) | |
| South Euclid, OH  44121, | ) | |
| | ) | **JURY DEMAND** |
| Defendant. | ) | **ENDORSED HEREON** |

<u>**PREFACE**</u>

1.      The ability to prevent unwelcomed visitors from entering private property is a fundamental element of the property rights of landowners and is hailed as "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072, 210 L. Ed. 2d 369 (2021). The right to exclude is of "central importance to property ownership." *Id.* at 2073. Plaintiffs Tenisha R. Wilson and Denman Gordon have labored for years to vindicate their fundamental right to defend their property in the City of South Euclid ("City") from unwanted intrusion by unwelcomed, hostile actors. Working collaboratively with those actors, the City has thwarted the Plaintiffs' efforts.

2.      The purpose of the Equal Protection clause of the Fourteenth Amendment of the U.S. Constitution "is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper

execution through duly constituted agents." *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445, 67 L. Ed. 340, 43 S. Ct. 190 (1923). Plaintiffs have been subjected to continuing intentional and arbitrary discrimination by the City as they have attempted to exercise their fundamental property rights. Plaintiffs are African American. They have been accused of being racists and engaging in illicit activity by an Assistant Cuyahoga County Prosecutor, who is white, and who has the ear of and influence over several City officials, and who, since 2006, has insisted on using Plaintiffs' driveway as a shortcut to visit nearby family and as a relief station for her pets. Plaintiffs' efforts to prevent her and others from using their driveway repeatedly have been stymied by the City.

3.      In December 2013, Plaintiffs commenced a civil action against the City in the Cuyahoga County Court of Common Pleas in *Tenisha R. Wilson, et al., v. City of South Euclid*, C.P. Case No. CV 13 818816 (the "State Action"), alleging  that, among other things, they had been subjected to disparate treatment and deprived of equal protection in their efforts to secure formal ownership of a short segment of a paper street hereafter referred to as the "Strip." (A survey of the Strip is attached to and incorporated into this Complaint by reference as **Exhibit 1**.) In May 2015 the Common Pleas Court granted summary judgment in the City's favor as to all of the Plaintiffs' claims, including their disparate treatment claim. The Cuyahoga County Court of Appeals reversed in June 2016 as to Plaintiffs' disparate treatment claim and two other claims (for judicial vacation and abandonment), and the City subsequently sought review in the Ohio Supreme Court. That Court declined jurisdiction to consider the City's appeal on October 26, 2016, and the case was remanded to the Common Pleas Court on November 23, 2016.

4.      After the case was remanded, Plaintiffs uncovered substantial additional evidence, and amended their complaint to add Cuyahoga County as a defendant solely for purposes of their abandonment claim. The County could have simply disclaimed any interest in the Strip. Instead,

represented by both an Assistant County Prosecutor and a lawyer in the County's Law Department, the County filed an Answer neither admitting nor denying any interest in the Strip but asserting <u>18 affirmative defenses</u>. Then the County served Plaintiffs with <u>22 interrogatories</u> and <u>39 requests for production</u> of documents. Then the County filed a motion for summary judgment asserting six frivolous reasons why the Court should dismiss the Plaintiffs' abandonment claim against it. The Common Pleas Court denied the County's motion. On August 16, 2022, the County sought leave to amend its answer to purportedly disclaim any interest in the Strip. But the amended answer neither admits nor denies that the County ever owned or abandoned any interest in the Strip. And it maintains the 18 affirmative defenses. The County has since acknowledged in open court, albeit disingenuously, that the County "got it wrong" in responding to the Plaintiffs' abandonment claim.

5.     Presently, the assistant county prosecutor who accused Plaintiffs of being racists and engaging in illicit activity is campaigning to replace the Honorable Deborah M. Turner on the Cuyahoga County Common Pleas Court in the November 2022 election. The Treasurer of her Campaign is Mo Romeo, who was a member of the South Euclid City Council in 2013. And based on reports filed with the Ohio Secretary of State, her campaign paid a relative of the City Law Director's for website creation.

6.     In the State Action, the City has too often dissembled about the facts, misrepresented Plaintiffs' claims and arguments, and attempted to mislead the Common Pleas Court as to the applicable law. The strategy has thus far stayed the Common Pleas Court from doing justice. Based on that and on the political matters described above, Plaintiffs lack confidence in the efficacy of the State Action to vindicate their rights. Accordingly, they have dismissed that action without prejudice and have decided to pursue relief in this Court.

**NATURE OF THE ACTION**

7.     Plaintiffs bring this action under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. §1983 to vindicate their federally protected rights against arbitrary and intentional disparate treatment by the City on the basis of their race and as a class-of-one with respect to their efforts to secure their property from unwanted intrusion and trespass.

**JURISDICTION**

8.     This Court's jurisdiction is premised on 28 U.S.C. §1331, 28 U.S.C. §§1343(a)(3) and (4), and 28 U.S.C. §§ 2201-2202.

9.     This Court also has jurisdiction over Plaintiffs' state law claim for declaratory relief as to abandonment based on 28 U.S.C. §1367.

**VENUE**

10.     Plaintiffs and the City are citizens of the United States which includes a municipal corporation organized under the laws of the State of Ohio, and venue exists within the jurisdiction of the United States District Court for the Northern District of Ohio, Eastern Division because all parties and the subject real property  are located within Cuyahoga County, Ohio, and the acts of the City alleged below were and continue to be committed within the jurisdiction of the United States District Court for the Northern District of Ohio, Eastern Division.

**PARTIES**

11.     Plaintiffs Tenisha Wilson and Denman Gordon are residents of the City of South Euclid, Ohio ("City").

12.     The City is a chartered municipal corporation pursuant to Article XVIII, Section 1 of the Ohio Constitution.

4

## THE PROPERTY

13.     Plaintiffs own and reside at the real property located at 1004 Newberry Road (a/k/a Newberry Avenue) in the City ("Property"). The Property is located in the Rosemere Subdivision. The Property includes a house, a detached garage, a driveway leading from Newberry Road to the garage, a sprinkler system that flanks the driveway, and a host of flowers, bushes, shrubs and other plants and landscaping.

14.     Newberry Road is a dead-end road. The Property is on the west side of Newberry Road at the dead-end as shown on **Illustration 1**. Plaintiffs' garage behind Plaintiffs' house is accessible only by a driveway that extends west from Newberry directly to the garage.



Illustration 1

## THE ROSEMERE SUBDIVISION

15.     The Rosemere Subdivision was created in 1916.

16.     At the time, there was no municipality in the County identified as "South Euclid." The Rosemere Subdivision was located in what was then known as Euclid Township.

17.     On or about June 24, 1916 the Euclid Township Board of Township Trustees approved a plat for the Rosemere Subdivision (the "Rosemere Plat") presented by the S.H. Kleinman Realty Co. ("SHK"). A copy of the Rosemere Plat is attached as **Exhibit 2**. The Rosemere Plat created 165 sublots and included five new roads - Chelston, Glenside, Clinton, Newberry, and Laurens Avenues ("Rosemere Roads") - all of which were to be 50 feet wide. *See, e.g.,* **Illustration 2** (excerpt from the Rosemere Plat).



Illustration 2

18.     As shown on the Rosemere Plat, SHK dedicated the land underlying the

Rosemere Roads "to the public for highways...." *See* **Illustration 3** (from the Rosemere Plat).

We the undersigned owners of land shown on this plat here-
by accept this plat and subdivision of the same and dedicate
to the public for highways the areas colored in yellow and desig-
nated as; Chelsto, Glenside, Clinton, Laurens and Newberry
Avenues and Green Road.  THE S.H. KLEINMAN REALTY CO.
by S.H. Kleinman President
by H.W. Stratmann Secretary

Illustration 3

19.     By resolution executed on or about July 19, 1916, the County Board of

Commissioners accepted for road purposes the dedication of land for the Rosemere Roads as

shown on the Rosemere Plat. A copy of the County Commissioners' "Resolution approving S.H.

Kleinman Realty Company's Rosmer [sic] Subdivision Dedication Plat" ("County Resolution")

is attached as **Exhibit 3**.

20.     The County Commissioners' acceptance of SHK's dedication of land for the

Rosemere Roads is also manifested on the Plat itself. *See* **Illustration 4** (from the Rosemere

Plat).

The dedication of land for Road purposes, as shown
on this plat, in yellow shade, was accepted by the Board of
County Commissioners of Cuyahoga County Ohio, by Reso-
lution adopted by said Board upon this 19 day of July
1916                                    F. G. Krause
July 19, 1916      Journal No. 73         Clerk of the Board

Illustration 4

21.     The County Resolution ordered the Rosemere Plat "to be placed upon the County

Road Record." On August 17, 1916, the Rosemere Plat was recorded in Vol. 58, P. 16 of the

Cuyahoga County Map Records.

22.     Of the Rosemere Roads, only Laurens Avenue has never been improved, constructed or opened. Laurens Avenue runs east and west and is shown on the Rosemere Plat as 50 feet wide. The Rosemere Plat, however, only included the northern 25-foot-wide half of the land intended for Laurens Avenue. (The 25-foot-wide land on the Rosemere Plat intended for Laurens Avenue is hereafter referred to as the "Paper Street.") The other 25-foot-wide swath of land needed to establish Laurens Avenue as the 50-foot-wide road shown on the Rosemere Plat was immediately south of and adjacent to the Rosemere Subdivision.

## THE PAPER STREET

23.     At the time the County accepted the dedication of land for the Rosemere Roads, Section 6861 of the Ohio General Code prohibited county boards of commissioners from locating or establishing any public roads less than 30 feet wide. (The same is true today per R.C. §5553.03(A) which applies to "all public roads located and established by the board of county commissioners subsequent to September 6, 1915".)

24.     By Resolution adopted on October 11, 1916, the Cuyahoga County Commissioners established "Rules and Regulations Controlling the Dedication of New Streets or Roads Within Cuyahoga County" ("10/11 Rules"). A copy of that Resolution is attached as **Exhibit 4**. In it, the County claimed exclusive authority to accept dedications of land for roads outside of municipalities. When created, the Rosemere Subdivision was outside of a municipality. Therefore, only the County could accept the dedication of the Rosemere Roads. The 10/11 Rules also established a 40-foot minimum road width for new roads in the County.

25.     In or about 1917, the portion of Euclid Township in which the Rosemere Subdivision was located was incorporated and became the Village of South Euclid ("Village").

26.     Between August 1916 and the incorporation of the Village in October 1917, the Paper Street was not widened.

8

27.     In 1919, the Village enacted Ordinance No. 18 which, among other things, required that new streets in the Village had to be at least 40 feet wide. (See **Illustration 5**.)

Section III     All streets branching off from Mayfield Road, Cedar Avenue, Warrensville Center, Green, Bluestone, Anderson Roads shall have a width of not less than 50 feet. All new streets connecting two or all of the above named highways shall have a width of not less than 60 feet; no streets accepted by the Village, shall have a width of less than 40 feet; but Council may refuse to accept even this minimum. In no instance shall streets be platted without terminating at the property lines of subdivision in which streets are located, unless by special permission of the Village Council. In the location of new streets, the line must conform as nearly as possible, to existing roads on record at time of filing plat, in order to secure continuity of cross and main roads.

Illustration 5

And on each side of the new street, there had to be a 5-foot-wide sidewalk. (See **Illustration 6**.)

Section X  On each side of new streets, stone or cement walks shall be laid to a width of not less than five (5) feet, and in a manner provided for by the Council.

Illustration 6

A copy of Village Ordinance 18 is attached as **Exhibit 5**.

28.     Ordinance No. 18 remained in effect until May 1945 when it was repealed by Ordinance No. 1780 which established a 50-foot minimum road width. The minimum road width in the City today remains 50 feet. South Euclid Code §723.06.

**THE VILLAGE PERMANENTLY RESTRICTS THE WIDTH OF THE PAPER STREET**

29.     Between late 1925 and early 1927, there were several road projects involving the intersection of Green and Anderson Roads adjacent to the Rosemere Subdivision. The population of the Village was growing quickly; the Village Council was trying to encourage the development of business along Green Road; and the configuration of Green Road in the area created concerns for safety.

30.     On or about October 14, 1925, several landowners signed the Dedication Map of Green Road Alteration ("GRA Map") dedicating to the public for highway use certain land at the intersection of Green and Anderson Roads. The GRA Map was approved and accepted by the Village on May 10, 1926 and accepted and approved by the County on June 2, 1926. On or about

9

July 2, 1926, the GRA Map was recorded in Vol. 98, p. 31 of the County Records. A copy of the GRA Map is attached as **Exhibit 6**.

31.     On November 14, 1926, the Cleveland Plain Dealer reported that the County had approved the development of a new subdivision immediately south of and adjacent to the Rosemere Subdivision describing how the proposed subdivision would consist of approximately 60 lots on Anderson Road and two 150-foot by 175-foot lots at the northwest and southwest corners of the intersection, and that the dedication of Anderson would help with the "straightening of Green Road at that point eliminating a very sharp and dangerous bend." The Plain Dealer also reported:

> In view of the $36,000,000 development recently announced by the Saltzer-Round Co. in the Green, Euclid and Belvoir section, and in view of the rapidly increasing population in South Euclid, the administration of the village of South Euclid established Green and Anderson as a new business section, allowing the entire Green Road frontage of the Green-Anderson development for business.

32.     In 1927, the owner of the land south of and contiguous to the Rosemere Subdivision proposed to subdivide that land as the Green-Anderson ("G-A") Subdivision. As shown on the G-A Plat, a copy of which is attached as **Exhibit 7**, the G-A Subdivision included 64 proposed sublots and dedicated land for Anderson Road, Homestead Road and Glenside Avenue.

33.     The G-A Plat dedicated no land for widening Laurens Avenue (although it did dedicate a 25-foot-wide strip of land on its western border for the extension of Homestead Road).

34.     On January 31, 1927, the Village approved and accepted the G-A Plat. The G-A Plat was recorded on February 28, 1927 in Vol. 103, P. 18 of the Cuyahoga County Map Records.

35.     The same day, the Village approved the plat of the Green Anderson Triangle Allotment ("GAT Plat") which dedicated additional land for highway use at the intersection of

10

Green and Anderson Roads. The GAT Plat was recorded on February 28, 1927, in Vol. 103, p.9 of the County Records. A copy of the GAT Plat is attached as **Exhibit 8**.

36.     On July 3, 1927, the Plain Dealer reported that the Green Anderson area had developed into a "progressive residential and business center," and that the extension of Anderson Road and straightening of Green Road were "progressing rapidly" thanks to "active co-operation of the Village council of South Euclid and the county commissioners."

37.     The machinations and road reconfigurations in 1926 and 1927 to make Green Road safer and the Green Anderson area a vital business hub, while forever condemning the Paper Street to being too narrow for use as a road is compelling evidence that the Village had abandoned any use of Laurens Avenue as a 50' wide (or any other viable width) road directly behind and adjacent to houses facing the 60' wide Anderson Road. Safety was a paramount concern in the development of the Green Anderson intersection. Establishing a 60-foot-wide road for automobiles and other vehicles in front of homes on the north side of Anderson while maintaining a 25-foot-wide road for automobiles and other vehicles behind those homes made no sense.

**DEVELOPMENT OF THE ROSEMERE SUBDIVISION**

38.     In June 1941, the Village of South Euclid became the City of South Euclid.

39.     At or about that time, the County Plat Books for South Euclid reflected that neither Laurens Avenue nor Newberry Avenue were open, as shown in **Illustration 7**. Excerpts



Illustration 7

from the 1941 County Plat Book for South Euclid from which Illustration 7 is taken are attached as **Exhibit 9**.

40.     The Rosemere Subdivision was developed in the late 1950's and 1960's. Plaintiffs' house was built in 1962. The Strip extends along the southern boundary of Plaintiffs' property. At the time Plaintiffs' house was built, the City's zoning code required that all new single-family homes in the City were required to have a garage in the rear yard, and a driveway on the same piece of land leading to it.

41.     Plaintiffs' garage is behind their house. It is accessible only from a driveway that has always been on the Strip and always maintained, repaired, and repaved by the Plaintiffs and their predecessors in interest, occasionally under threat of prosecution by the City.

42.     The Paper Street has never been constructed, improved, or opened for use as a public road.

43.     By approving the G-A Plat in 1927 without requiring the owner of that land to dedicate additional land to augment the Paper Street to a lawful width, the Village forever prevented the Paper Street from being used for the sole purpose for which it was dedicated and accepted by the County.

44.     The City's permitting the construction of Plaintiffs' house with a garage accessible only by a driveway located on the Strip and requiring Plaintiffs and their predecessors in interest to maintain, repair, and replace the Strip, including the driveway, were wholly consistent with the Village's abandonment of the Strip.

### THE DISPUTE

45.     On numerous occasions dating back to the 1980's, at the latest, the City explicitly and implicitly threatened criminal prosecution if Plaintiffs or their predecessors in interest failed to make corrections and repairs to the Strip pursuant to citations and notices issued by the City.

On or about September 26, 2001, for example, South Euclid City Inspector, Don Nickerson conducted an inspection of the Property, including the Strip.

46.     On or about October 2, 2001, Mr. Nickerson issued Plaintiff Wilson a citation for maintenance code violations, including charges for the removal of litter and debris from the Strip and the elimination of depressions and filling of cracks to the asphalt driveway.

47.     In response, Plaintiff Wilson performed the maintenance and repairs required by the October 2, 2001 citation at her own personal expense without any monetary support, labor, or maintenance performed by the City.

48.     On or about July 11, 2002, the City issued a letter of non- compliance and of code violations to Plaintiff Wilson for charges related to the elimination of the depressions and repair of cracks in the asphalt driveway on the Strip.

49.     On or about July 31, 2002, Plaintiff Wilson received a letter from the City's Chief Building Official threatening a maximum penalty of six months, a fine of $1,000.00, and additional charges for each day the repairs were not made.

50.     In response, Plaintiff Wilson performed the maintenance and repairs required by the July 11, 2002 and July 31, 2002 citations at her own personal expense without any monetary support, labor, or maintenance performed by the City of South Euclid.

51.     On or about May 20, 2003, Plaintiff Wilson received a letter from Mr. Nickerson regarding the care and maintenance of the Strip.

52.     On or about July 31, 2003, Plaintiff Wilson received a re-inspection letter from Mr. Nickerson regarding the installation and maintenance of yard area plantings, shrubbery, trees, grass, and ground cover. Plaintiff Wilson was afforded thirty (30) days to complete the required maintenance and repairs to the Strip.

53.     On or about August 12, 2003, less than thirty (30) days after Plaintiff Wilson received a re-inspection letter, Plaintiff Wilson received a second letter of re-inspection regarding compliance with the maintenance and care of the Strip.

54.     Plaintiff Wilson performed the maintenance and repairs required by the May 20, 2003, the July 21, 2003, and the August 12, 2003 citation at her own personal expense without any monetary support, labor, or maintenance performed by the City.

55.     On or about April 10, 2006, Plaintiff Wilson received a notice and consent form to authorize the inspection of the property by Frank Reale, Building Inspector for the City of South Euclid.  Plaintiff Wilson signed the consent form on April 10, 2006.

56.     On or about April 20, 2006, Plaintiff Wilson received the same notice and consent form she received and signed on April 10, 2006, absent the property address. Plaintiff Wilson again signed the consent form.

57.     Following Plaintiff Wilson's second authorization in 2006, Mr. Reale conducted an inspection and issued Plaintiff Wilson a citation for the failure to maintain the Strip.

58.     In response, Plaintiff Wilson repaired the asphalt driveway at her own expense without any monetary support, labor, or maintenance performed by the City.

59.     Mr. Reale also noted that trees located on the Strip were rotting and would soon need to be cut down at Plaintiff Wilson's expense to avoid future citations.

60.     On another occasion in 2006, as Ms. Wilson was engaged in some yardwork, she noticed a woman walking her dog down the driveway toward Newberry. The woman, an Assistant County Prosecutor, stopped as her dog relieved itself on the driveway.

61.     Ms. Wilson asked the woman what she was doing. The woman responded that the driveway was public property, that she had a right to be there, and that she was a lawyer and knew her rights.

62.     In 2007, Plaintiff Wilson was forced to replace the roof of her home as well as the wood sheeting due to damage caused by the trees located on the Strip which hung over the side of her home causing algae and moss to grow on the roof resulting in rot. The cost of repair was approximately $8,000-$9,000, which Plaintiff Wilson paid.

63.     The trees were ultimately cut down (by the electrical utility out of concern for the nearby power lines), but the tree stumps and roots remain. The roots permit water to flow into the premises of the Property.

64.     On or about April 8, 2008, Mr. Reale conducted an additional inspection.

65.     Based ostensibly on his inspection, Mr. Reale issued Plaintiff Wilson a citation to eliminate depressions and fill cracks in the asphalt driveway on the Strip, and to fill tire ruts and re-seed grass along the asphalt driveway.

66.     In response, Plaintiff Wilson performed the repair work at her own expense without monetary support, labor, or maintenance performed by the City.

67.     Sometime after August 2008, Plaintiff Wilson learned that in 1961, the City had vacated a portion of the Paper Street that extended along the southern boundary of the parcel directly across the street from the Property.

68.     In the ordinance vacating the property, the City noted that vacation of the portion of the Paper Street was necessary and appropriate to alleviate the burden on the public and to lessen the cost of roadway expense to the City of South Euclid.

69.     In January 2010, there was a water main break at the rear of the Property.

70.     The City of Cleveland Water Department ("Water Department") repaired the water main and advised Plaintiff Wilson that it would return to repair the hole it created as a result of its water main repair work.

71.     On or about January 7, 2010, the Water Department returned to back fill the hole left on the property.

72.     In the course of that work, the area under one of the Water Department's trucks gave way and the truck became stuck. While attempting to dislodge the truck, additional utility vehicles became stuck.

73.     Efforts to free the vehicles caused the asphalt on the Strip to crack and left depressions in the asphalt. They also caused considerable damage to the surrounding grass area causing two-foot-deep ruts around the lawn.

74.     The Water Department wrote an incident report and informed Plaintiff Wilson that it would return to fix the damage once the snow had cleared.

75.     The following spring, Plaintiff Wilson was warned by the City that she would be issued a citation if she did not repair the asphalt on the Strip that was damaged by the Water Department.

76.     In response to concerns expressed by Ms. Wilson, City Inspector Leonard Washington scheduled a meeting to be held at the Property and attended by Ms. Wilson, the Water Department and the City.

77.     At the meeting, the Water Department indicated that the Strip was owned by the City and that the Water Department would not bear responsibility for the cost or labor needed for the repairs.

78.     The City did not repair the damage caused by the Water Department.

79.     Instead, Plaintiff Wilson attempted to make the repairs at her own expense without monetary support, labor, or maintenance performed by the City.

80.     In 2010, after making considerable repairs and performing other maintenance on the Strip, Plaintiff Wilson again contacted the City about vacating the Strip.

16

81.     On or about August 6, 2010, Plaintiff Wilson contacted the City's Law Director, Michael Lograsso, at the direction of Mr. Kowalczyk, regarding vacating the Strip.

82.     Plaintiff Wilson indicated that due to her continued receipt of citations, the considerable financial expense she incurred to maintain the Strip, and the City's failure to maintain or care for the Strip, the Strip should be vacated to her.

83.     Plaintiff Wilson received no response to her August 6, 2010 letter.

84.     In July 2013, Plaintiff Wilson forwarded a copy of her August 6, 2010, letter to Mr. Lograsso.

85.     On or about July 10, 2013, Mr. Lograsso's secretary scheduled a meeting between Mr. Lograsso and Plaintiff Wilson for July 11, 2013.

86.     On or about July 11, 2013, Plaintiff Wilson met with Mr. Lograsso and two other City officials regarding vacation of the Strip. Plaintiff Wilson was advised that while a vacation was possible it would be costly because each neighbor would need to be contacted before a vacation could occur. Ms. Wilson was told that, unlike her neighbor directly across the street, no more than one-half of the width of the Strip could be vacated to her in any event.

87.     In the summer of 2013, Plaintiffs got married. In advance of their wedding, Ms. Wilson asked the City to provide some protection against trespass during a party to be held in Plaintiffs' yard.

88.     The City posted "No Trespassing" signs at the front and rear of Plaintiffs' property, and a third sign at the front of the parcel of land adjacent to and west of the Plaintiffs' property.

89.     Shortly after the signs went up, Ms. Wilson was confronted by the assistant county prosecutor who accused Ms. Wilson of posting the signs and demanded to know if that was because she, the assistant county prosecutor, was white.

90.     When she learned that the City had posted the signs, the assistant county prosecutor stated that she "knew" people at the City and would see about the signs.

91.     On or about July 14, 2013, and July 15, 2013, Plaintiff Wilson filed a victim/witness statement with the South Euclid Police Department based on the assistant county prosecutor's trespass, harassment and accusations in response to the "No Trespassing" signs erected by the City.

92.     On or about August 4, 2013, the "no trespassing" signs were removed (though the posts on which the City placed the signs remain).

93.     Plaintiff Wilson immediately attempted to get in touch with Mr. Lograsso to inquire about their removal, but her calls were not returned.

94.     Plaintiff Wilson then contacted a member of the City Council, Ms. Gray, for assistance.

95.     Thanks in part to Ms. Gray's efforts, City Council met on several occasions in September and October 2013 to consider possible solutions to Plaintiffs' problems with trespassers.

96.     Plaintiffs attended these meetings and explained the difficulties they were having. Other residents of the City, including the assistant county prosecutor, also attended these meetings to oppose any relief the City might give, going so far as to demand that Plaintiffs be forbidden from using their driveway despite Plaintiffs' having no other way to access their garage.

97.     At a public meeting in September 2013, the City Council, city officials, and residents discussed the Paper Street. During that meeting, the City's Law Director and Service Director stated that the City did not take care of paper streets within its borders. This was

18

consistent with the experience of Plaintiffs and their predecessors in interest, who maintained, repaired, and replaced the Strip, including the driveway and yard.

98.     During the October 2013 meeting, one of the opponents to Plaintiffs' efforts to secure the Property against trespass and unwanted intrusion, including the assistant county prosecutor, suggested that the presence of their cars on Plaintiffs' driveway indicated the possibility of illicit drug activity on the Property.

99.     As a result of the accusation, Ms. Gray, who is African American, walked out of the meeting. In a subsequent email dated October 24, 2013 to colleagues on the City Council, Ms. Gray explained:

> First let me say thank you for meeting with two residents on West Anderson Road in regards to the paper street. As you could see the meeting became challenging and I was tires. However, the lady's statement impling [sic] that cars parked at the Gordon's home maybe an indicator of drug activity (this has some major biases and demonstrates an extreme lack of cultural sensitivity). It was too much for me to stomach and before I found myself in the middle of another debate I left. I hope that you do not believe this insidious accusation. I hope council will be fair minded in its decision making. Just my thoughts.

100.     The City claims that Plaintiffs never submitted a "formal" application to vacate the Strip. The City has never provided Plaintiffs with a specific form it claims must be filled out or filed in order to request vacation. Nor does the City have such a specific form.

101.     The City never directed Plaintiffs to the provisions of its Codified Ordinances spelling out how a landowner in the City can request that part of a street be vacated. Indeed, there are none (other than to require a filing fee of $500).

102.     In 2014, after the State Action was commenced, at the City Law Director's direction, the City began sending workers to the Strip to cut the grass (even when it wasn't needed). In 2018, City workers cleared out all of the plants Plaintiffs had planted and maintained along the driveway, and drastically pruned some of the bushes along the southern boundary of

the Strip in order to fundamentally alter its appearance to make it appear that the Strip has always been maintained as a well-travelled pathway.

103.     During the September 2013 Council meeting, the City's Service Director confirmed that the City did not take care of paper streets in the City. After the State Action was filed, however, the City insisted that it has always owned and cared for the Strip, and the service director has produced records the City claims establish that on no fewer than 100 occasions, the City allegedly rendered maintenance and service on the Paper Street dating back only to 2004. There are no references anywhere in the records to Laurens. Between 2010 and mid-2014, moreover, there is no reference to Newberry. The only references to Newberry that are in the records are to "Newberry dead end."

## COUNT ONE - DISPARATE TREATMENT AND DEPRIVATION OF EQUAL PROTECTION

104.     Plaintiffs restate and incorporate by reference the allegations set forth in Paragraphs 1 through 103 above as if fully rewritten herein.

105.     The City previously vacated a portion of the Paper Street to the owner of the property directly across Newberry from Plaintiffs' Property, after deeming the cost of maintaining that "small portion of Laurens Road" an "unnecessary burden to the public," and stating that the addition of that strip to the abutting property will yield taxes that "lessen roadway expense to the City." The homeowner to whom the City vacated the eastern-most segment of the Paper Street directly across Newberry from Plaintiffs' Property was white.

106.     The City has previously vacated portions of other roads under similar circumstances.

107.     Plaintiffs made repeated requests to the City to vacate the Strip. The City never considered any. It claims that Plaintiffs' multiple requests were not properly made, but never informed Plaintiffs how to make a proper request and never considered vacating the Strip.

Instead, the City considered granting Plaintiffs a "revocable license" in the Strip. A revocable license would have been terminable at any time by the City for any reason and, for that reason, would have lacked efficacy as a means for Plaintiffs to prevent trespassers. Regardless, the City never approved such a license.

108.    The City has asserted that the Strip should not be vacated because a water line is located within the Paper Street.

109.    The City has vacated roads or portions of roads while reserving easements in the vacated roads for utility purposes.

110.    Plaintiffs have never sought the vacation of, or asserted rights to, the entire length of the Paper Street, but have instead confined their requests to the Strip.

111.    The only "use" to which the Strip had been put prior to the commencement of the State Action, apart from use by the Plaintiffs, their predecessors in interest, and their respective guests and invitees, was the occasional trespass by strangers traveling to or from Newberry as a shortcut.

112.    After the case was commenced, use of the Strip increased. Plaintiffs are informed and believe that one reason the use of the Strip by strangers has increased is because a nearby resident encouraged children to use the Paper Street (including the Strip) as a shortcut to a nearby school.

113.    The City has refused to vacate the Strip out of deference to and/or on behalf of a small handful of residents who have no legal interest in the Strip, do not live next to it, and, at least some of whom, are hostile to Plaintiffs on account of their race.

114.    Under Ohio law, "a conveyance intended to benefit only a small portion of the public does not constitute a dedication of property for public use." *Snyder v. Monroe Township Trustees*, 110 Ohio App. 3d 443, 456, 674 N.E.2d 741 (2nd Dist. Miami 1997).

115.    Since the State Action was commenced, the City has begun to devote City resources to the maintenance and upkeep of the Strip despite the fact that Plaintiffs have continued taking care of the Strip as did their predecessors in interest.

116.    In 2003, Plaintiffs were cited by the City because much of the grass in their yard, including on the Strip, was dead. The City determined that the lawn was grub-infested and required Plaintiffs to replace all of the grass, bushes, flowers, and other vegetation. Plaintiffs complied, and replaced all of the grass, bushes, flowers and other plants, and continued to maintain their landscaping, including on the Strip.

117.    On or about April 13, 2018, the City had its workers clear out all of the plants Plaintiffs had planted and maintained along the driveway, and drastically pruned some of the bushes along the southern boundary of the Strip in an attempt to make it appear that the Strip has always been maintained as a well-travelled pathway open for use by the public. The extent of the City's clearing and pruning in April 2018 far exceeded any work the City had ever done before on the Strip. The City did not perform similar work on the lot behind Plaintiffs' Property.

118.    The lot behind Plaintiffs' Property is wooded and undeveloped, and has been since Ms. Wilson moved into her house on Newberry. The City has not performed landscaping work on it.

119.    The City has damaged and continues to damage Plaintiffs' property as its workers have "maintained" the Strip.

120.    As described above, the City has intentionally treated Plaintiffs differently from others similarly situated without any rational basis for the difference in treatment.

121.    The City has also intentionally treated Plaintiffs different from others similarly situated based on their race.

122.    The City's treatment of the Plaintiffs since Plaintiffs attempted to assert rights

over the Strip has been intentionally malicious, irrational, and wholly arbitrary.

123.     As a direct and proximate result of the City's disparate treatment and deprivation of Plaintiffs' Equal Protection rights under the 14th Amendment to the U.S. Constitution, as described above, Plaintiffs have suffered and continue to suffer stress, inconvenience, embarrassment, and other harm, and have incurred losses, for all of which they are entitled to recover damages in an amount to be determined at the trial of this case but believed to be in excess of $25,000, together with pre-judgment interest, costs and expenses, reasonable attorney's fees pursuant to 42 U.S.C. §1988, and such other relief as the Court determines is just and proper.

## COUNT TWO – DECLARATORY JUDGMENT
## AS TO ABANDONMENT AND OWNERSHIP OF THE STRIP

124.     Plaintiffs restate and incorporate by reference the allegations set forth in Paragraphs 1 through 123 above as if fully rewritten herein.

125.     By approving the G-A Plat, and taking other similar actions in the same area near or adjacent to the Strip, the City and its predecessor Village rendered the Strip incapable of being put to the sole use for which it was dedicated and for which that dedication was accepted, namely road use. It is just 25 feet wide. The City, Village, County, and General Assembly all unequivocally and expressly require that roads must be at least 30, 40, or 50 feet wide.

126.     At the time of South Euclid's incorporation, the County owned a fee simple determinable interest in the Paper Street by operation of law. Euclid Township owned no real property interest in the Paper Street.

127.     By approving the G-A Plat, and taking other actions described above in 1927, without requiring the owner of that property to dedicate any land to augment the Paper Street, the Village forever precluded the Strip from being more than 25 feet wide.

23

128.     As a consequence of that approval, any interest in the Paper Street owned by the County terminated by operation of law and reverted to SHK and its successors in interest.

129.     As a result of the reverter, there was no real property available to or owned by the Village or the City on which to build, improve or open a public road where the Paper Street had been located.

130.     Between 1927 and 1948, moreover, neither the Village nor the City improved, constructed, built, or opened the Paper Street for road purposes.

131.     After the Plaintiffs' house was built in 1962, moreover, the City required Plaintiffs and their predecessors in interest to maintain and care for the Strip as if it were their own, often under threat of criminal prosecution.

132.     The City's codified ordinances required Plaintiffs and their predecessors in interest to have off-street parking available behind the house. Owing to the narrowness of the Property and the size of Plaintiffs' house as approved by the City in 1962, the only way to gain access to the garage behind Plaintiffs' house was by a driveway on the Strip that leads to the garage.

133.     Other properties along the north side of the Paper Street in the Rosemere Subdivision also include paved driveways within the Paper Street that are used solely for parking on those properties.

134.     Since 1982, various City officials have stated that the Strip is not the City's property and that the City does not care for paper streets.

135.     Since 1996 at the very latest, moreover, roads in the City have been required to be at least 50 feet wide. At no time have the City's ordinances established a minimum road width of less than 30 feet. The City's own ordinances prohibit the Paper Street from being opened and used for a road.

24

136.    For the reasons set forth above, Plaintiffs are entitled to a judgment in their favor declaring that the City, through its predecessor Village or otherwise, abandoned or otherwise lost any rights it had to use the Strip for roads or otherwise, and that Plaintiffs are the true owners of the Strip.

**WHEREFORE**, Plaintiffs Tenisha Wilson and Denman Gordon, demand judgment against Defendant City of South Euclid as follows:

1.    As to Count One, damages in an amount to be determined by a jury at the trial of this case, believed to be in excess of $25,000, together with prejudgment interest, costs and expenses of suit, and reasonable attorneys fees pursuant to 42 U.S.C. §1988; and

2.    As to Count Two, Judgment declaring that the City lost or abandoned any ownership or other rights it had to use the Strip for roads or otherwise, and that Plaintiffs are the true owners of the Strip as described in the attached survey; and

3.    All such additional relief to which the Court or a jury finds Plaintiffs are due, at law, in equity, or otherwise.

<u>**PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY
ON ALL ISSUES SO TRIABLE**</u>.

Respectfully submitted,

s/ Benjamin J. Ockner
Benjamin J. Ockner (0034404)
Berns, Ockner & Greenberger, LLC
3733 Park East Drive, Suite 200
Beachwood, Ohio 44122
Telephone:  (216) 831-8838
Facsimile:   (216) 464-4489
Email:  bockner@bernsockner.com
*Attorney for Plaintiffs*